1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                 SOUTHERN DISTRICT OF CALIFORNIA

10

11   NICHOLAS YPHANTIDES, an              Case No.:  21cv1575-GPC(BLM)
     individual,
12                                         **ORDER GRANTING IN PART AND**
                                Plaintiff,  **DENYING IN PART DEFENDANT'S**
13                                         **AMENDED MOTION FOR**
     v.                                    **PARTIAL SUMMARY JUDGMENT**
14
     COUNTY OF SAN DIEGO, a public
15   entity and DOES 1-10 inclusive,
16                              Defendant.  **[Dkt. Nos. 46, 61.]**

17

18        Before the Court is Defendant County of San Diego's amended motion for partial

19   summary judgment[1] on the third through eleventh causes of action alleged in the

20   complaint.  (Dkt. No. 61.)  Plaintiff filed an amended opposition.  (Dkt. Nos. 60.)

21   Defendant filed an amended reply.  (Dkt. No. 62.)  Based on the reasoning below, the

22

23   ──────────────────

24   [1] Defendant filed its motion for partial summary judgment on December 16, 2022 which was fully
     briefed on January 27, 2023.  (Dkt. Nos. 46, 48-54, 57.)  In their briefing, the parties failed to cite to the
25   exhibit number for each evidence relied upon.  (*See id.*)  Therefore, on February 7, 2023, the Court
     directed the parties to filed amended briefs as well as an amended separate statement and opposition to
26   undisputed material facts and amended additional material facts by Plaintiff to include the exhibits
     numbers.  (Dkt. No. 59.)  The parties filed their amended briefs.  (Dkt. Nos. 60, 61, 62.)  However, for
27   purposes of citation, the Court relies on the evidence submitted in the parties' original filings.  (Dkt.
     Nos. 46, 48-54, 57.)
28

Court GRANTS in part and DENIES in part Defendant's amended motion for partial summary judgment.

## Background

On September 8, 2021, Plaintiff Nicholas Yphantides, M.D. ("Plaintiff" or Dr. Yphantides"), the former Chief Medical Officer of the County of San Diego, filed a complaint against Defendant County of San Diego ("Defendant" or "County") for 1) unlawful medical and psychological inquiry and psychological and medical examination in violation of California Government Code ("Government Code") section 12940(f); 2) unlawful medical and psychological inquiry and psychological and medical examination in violation of the Rehabilitation Act of 1972, 42 U.S.C. § 12112(d)(1)(4); 3) disability discrimination or perceived disability discrimination in violation of Government Code section 12940(a); 4) failure to provide reasonable accommodation in violation of Government Code section 12940(m); 5) failure to engage in the interactive process in violation of Government Code section 12940(n); 6) retaliation for requesting disability accommodations in violation of Government Code section 12940(m)(2); 7) failure to prevent discrimination and retaliation in violation of Government Code section 12940(k); 8) interference with the right to medical leave in violation of Government Code section 12945.2, *et seq*.; 9) retaliation for taking medical leave in violation of Government Code section 12945.2, *et seq*.; 10) interference with the right to medical leave in violation of 29 U.S.C. § 2601 *et seq*.; and 11) retaliation for taking medical leave in violation of 29 U.S.C. § 2601, *et seq*.  (Dkt. No. 1, Compl.)

Defendant moves for partial summary judgment on the third to eleventh causes of action arguing they fail as a matter of law because the material facts are undisputed. (Dkt. No. 61.)  Plaintiff opposes arguing there are material facts in dispute.  (Dkt. No. 60.)  Defendant filed a reply.  (Dkt. No. 62.)

/ / /

/ / /

/ / /

**Factual Background**

**A.  Background on Dr. Yphantides' Onset of Mental Disability**

In 1992, Dr. Yphantides graduated from University of California, San Diego School of Medicine with honors and attended a one-year internship at Ventura County Medical Center in 1992-93.  (Dkt. No. 60-4, Yphantides Decl. ¶¶ 3, 4.)  During the internship, Plaintiff experienced his first mental health crisis of "depression that evolved into hypomania[2] while working under extreme stress and sleep deprivation."  (*Id.* ¶ 4.)  Though Plaintiff was not tuned into his hypomania state, his colleagues recognized his symptoms and were supportive.  (*Id.*)  He was granted medical leave and sought treatment from a psychiatrist who diagnosed him as being on the bipolar spectrum and was prescribed and took Lithium, a mood stabilizer.  (*Id.*)  Once he returned from medical leave, the internship program accommodated him by restructuring his duties and schedule such as reducing his on-call schedule, admitting fewer patients, and he was assigned a senior resident to monitor his condition.  (*Id.*)  With the accommodations, he was able to complete the program.  (*Id.*)  Except for a couple of relapses of depressive episodes, his condition remained stable and he was able to perform his job duties without additional workplace accommodations.  (*Id.* ¶ 5.)  After he finished his training, he was a full-time clinician for three years, and then in 1996, he transitioned into public and population health when he was publicly elected to be the Chairman of the Board for Palomar Health.  (*Id.*)

**B.  Dr. Yphantides' Employment with County of San Diego**

Plaintiff began consulting with Defendant County of San Diego in 2007 and became employed as the Chief Medical Officer ("CMO") with the County in April 2009

---

[2] Dr. David Printz, Plaintiff's treading psychiatrist, testified that hypomania is a symptom or on the spectrum of bipolar disorder.  (Dkt. No. 53-11, Olsen Decl., Ex. 313, Printz Depo. at 67:3-10.)  Hypomania and mania have the same symptoms but hypomania is less severe and include insomnia, rapid speech, impulsivity, disorganized thought process, recklessness and grandiosity.  (*Id.* at 58:15-59:5; 67:3-10.)

in a part-time capacity.  (*Id.* ¶ 6; Dkt. No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 21:8-11; 27:20-28:5.)  As CMO, Plaintiff was an "unclassified" or "at will" employee.  (Dkt. No. 60-2, Pl's Response to SSUF No. 1.)  In September 2016, he became the County's full-time CMO which is the position he held until his termination on March 22, 2021.  (Dkt. No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 27:20-28:5; Dkt. No. 46-3, Klekowski Decl., Ex. 257, Evers Depo. at 51:17-52.)

As CMO, Plaintiff was responsible for representing the County well because his conduct reflected upon the County.  (Dkt. No. 60-2, Pl's Response to SSUF No. 2.)  All County employees must behave ethically and as a supervisor, Plaintiff was held to a higher ethical and moral standard.  (*Id.*, No. 3.)  In 2016, Plaintiff began receiving annual performance evaluations where his continually scored "exceeds expectations" through September 2020.[3]  (Dkt. No. 60-4, Yphantides Decl. ¶ 6; Dkt. Nos. 50-6 to 50-9, Klekowski Decl., Exs. 27-30.[4])

Nick Macchione ("Mr. Macchione"), Director of the County's Health and Human Services Agency ("HHSA") was Plaintiff's direct supervisor until May 1, 2020 when Dean Arabatzis ("Mr. Arabatzis") became the Acting Director of HHSA.  (Dkt. No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 28:15-29:25.)  Plaintiff, Mr. Macchione and Mr. Arabatzis and their families have known each other for years and routinely socialized outside of work.  (Dkt. No. 60-4, Yphantides Decl. ¶ 10.)  Kimberly Evers ("Ms. Evers") has been the Director of Human Resources for the HHSA since 2015.  (Dkt. No. 46-4, Evers Decl. ¶ 1.)  Susan Brazeau ("Ms. Brazeau") has been the Director of Human Resources for the County of San Diego since 2013.  (Dkt. No. 46-5, Brazeau Decl. ¶ 1.)

---

[3] The Court notes that Plaintiff received "meet" expectations on "organizational acumen" on a couple of reviews including the September 2020 review.  (Dkt. No. 50-9, Klekowski Decl., Ex. 30.)
[4] Plaintiff's Exhibit 1 is duplicative of Exhibit 30.

Beginning in January 2020, due to the COVID 19-pandemic, Plaintiff began working long hours of up to 15 hours per day. (Dkt. No. 60-4, Yphantides Decl. ¶ 8.) He experienced an extended period of intense stress, anxiety and insomnia from January 2020 until his first medical leave on October 14, 2020. (*Id.*) During this time, he was treated with an anti-depressant prescribed by Dr. James Lin ("Dr. Lin"), Plaintiff's primary care physician. (*Id.* ¶ 9.) However, by October 2020, Plaintiff was in deep depression. (*Id.*) At that time, he retrieved his handgun, and went into a closed closet at his home to commit suicide but the thought of his two teenage daughters prevented him from following through. (*Id.*) He called his brother to take the gun away which he did. (*Id.*)

Starting in August 2020, Plaintiff shared with Mr. Arabatzis, his direct supervisor, that he was stressed and Mr. Arabatzis would respond with suggestions of taking time off and other things. (Dkt. No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 102:14-103:1.) Because of the COVID-19 pandemic, Plaintiff felt he could not take leave because there was no time, no person to take his place and he felt like he was still capable of performing his duties. (*Id.*) When he got to the point of not sleeping for two or three days due to insomnia, Plaintiff felt he was not able to perform his duties and informed Mr. Arabatzis in greater detail about the seriousness of his condition. (*Id*. at 103:2-8.) In October 2020, he reached out to each of his seven "direct reports" and told them he was "struggling" and was going to take time off. (*Id.* at 103:14-25.)

## C.   Dr. Yphantides First Medical Leave – October 14, 2020 to November 16, 2020

Plaintiff requested, was approved and took FMLA leave from October 14, 2020 to November 16, 2020. (Dkt. No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 101:5-101:13.) The Medical Certification for FMLA Leave was signed by Dr. Lin on October 12, 2020. (Dkt. No. 46-3, Klekowski Decl., Ex. 93 at 13.[5]) On the Medical

---

[5] Page numbers are based on the CM/ECF pagination.

Certification, Dr. Lin responded in the negative when asked if the employee is unable to perform any of his/her job functions due to the condition and "N/A" to the questions of "[w]ill the employee need to attend follow-up treatment appointments or work part-time or on a reduced scheduled due to the medical condition?" and "[w]ill the condition cause episodic flare-ups periodically preventing the employee from performing his job functions." (*Id.* at 15.)  However, on Plaintiff's FMLA leave request, Plaintiff checked the box for the reason for his leave, "Employee is unable to perform the essential functions of his/her job due to a serious health condition." (*Id.* at 17.)

**D.    Dr. Yphantides' Return to Work**

Plaintiff returned to work around November 17, 2020.  (Dkt. No. 60-4, Yphantides Decl. ¶ 11.)  Upon his return, Plaintiff did not make any requests for accommodations. (Dkt. No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 94:13-19; 106:2-5.)  Yet, while he was no longer suicidal, he was not "fully recovered" or back to his "usual self" which he openly communicated with his colleagues, such as Denise Foster, Chief of Nursing, and Jamie Beam, Assistant Director of Medical Care Services, in his return email.  (Dkt. No. 60-4, Yphantides Decl. ¶ 11; Dkt. No. 51-1, Olsen Decl., Ex. 38, 11/18/20 email.)  When he returned from leave, Plaintiff informed several colleagues, including Ms. Evers and Andrew Pease ("Mr. Pease"), Chief Operating Officer of HHSA, about his depression and lack of sleep while he was on medical leave as well as his suicidal ideation.  (Dkt. No. 60-4, Yphantides Decl. ¶ 12; Dkt. No. 53-3, Olsen Decl., Ex. 305, Pease Depo. at 43:3-13; Dkt. No. 53-1, Olsen Decl., Ex. 303, Evers Depo. at 113:14-115:12.)  Mr. Arabatzis testified that Plaintiff told him that during his FMLA leave in October-November he was suffering from depression and had suicidal ideation.[6]  (Dkt. No. 52-19, Olsen Decl., Ex. 301, Arabatzis Depo. at 35:23-36:5; 59:7-18; *see also* Dkt. No. 60-4, Yphantides Decl. ¶ 10.)

---

[6] It is not clear from the record whether Plaintiff told Mr. Arabatzis about his depression and suicidal ideation while he was on leave or after he returned.

In November 2020, Plaintiff felt compelled to return to work for his colleagues and the community because COVID-19 was peaking.  (Dkt. No. 60-4, Yphantides Decl. ¶ 13.)  For the next seven to eight weeks, he executed his duties as the CMO under a very heavy workload, including working through the night.  (*Id.*)  As COVID-19 cases increased in December 2020, Plaintiff worked on weekends and through the holidays, was unable to sleep and "it felt like cycling wheels in my head."  (*Id.*)

Plaintiff testified that he had to perform his normal executive duties as a CMO as well as the additional responsibility of his duties handling the COVID-19 crisis, and because he saw Mr. Arabatzis everyday, by January 2021, Plaintiff "frequently, [and] multiple times" told Mr. Arabatzis that he wanted help with unloading administrative responsibilities.  (Dkt. No. 52-18, Olsen Decl., Ex. 300, Yphantides Depo. at 114:19-115:25; *see also* Dkt. No. 60-4, Yphantides Decl. ¶ 12.)  He testified that he specifically asked Mr. Arabatzis to intervene.  (*Id.* at 148:1-6.)  He also stated that Mr. Arabatzis was the only person who initiated conversations about his mental health asking how he was doing or feeling, and Plaintiff would respond honestly so Mr. Arabatzis knew "how bad things had gotten in October for sure."  (*Id.* at 149:9-23.)  But Mr. Arabatzis, because it was chaotic back then, would punt the issue to Mr. Macchione with no solution or assistance and Mr. Macchione would punt it back to Mr. Arabatzis.  (Dkt. No. 52-18, Olsen Decl., Ex. 200, Yphantides Depo. at 115:17-116:3; 148:10-19.)  He testified it "felt like there was hot potato supervision going on."  (*Id.* at 148:18-19.)

Around January 10, 2021, Plaintiff learned that a gorilla was infected with COVID.  (Dkt. No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 184:17-185:19.)  The County alleges it learned about Plaintiff's poor judgment regarding his involvement with a COVID infected gorilla at the San Diego Zoo in January 2021.[7]  (Dkt. No. 61 at 13.)  It

---

[7] The Court notes that pages 193 and 202 of Plaintiff's deposition cited in Defendant's brief, (Dkt. No. 61), to support the facts behind the Zoo incident, are not in the record.  (*See* Dkt. No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo.)

appears that Plaintiff advocated for a public media event even though the Zoo did not. (*Id.*)  Plaintiff acknowledged that he demonstrated good judgment concerning treatment of the gorilla but did not demonstrate good judgment when he advocated for a planned media event.  (Dkt. No. 46-3, Yphantides Depo. at 80:3-18; 185:17-19; 194:20-195:10.)

On January 13, 2021, at the request of Defendant, Plaintiff had a telephonic meeting with Mr. Arabatzis, Ms. Evers, and Mr. Pease where they expressed concern about Plaintiff's mental health and that if his work performance did not immediately improve, he would be terminated.  (Dkt. No. 60-4, Yphantides Decl. ¶ 14; *see also* Dkt. No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 116:20-25; Dkt. No. 46-3, Klekowski Decl., Ex. 255, Arabatzis Depo. at 120:14-24.)  In that call, Plaintiff was made aware of one alleged incident where he advocated for a press conference regarding monoclonal antibody treatment he obtained for a COVID infected gorilla at the San Diego Zoo.  (Dkt. No. 60-4, Yphantides Decl. ¶ 15.)  During the call, Mr. Arabatzis stated that Plaintiff's mental well-being was impacting his performance.  (*Id.* ¶ 14.)  He also accused Plaintiff of "irrational" behavior and said he wanted him out of the workplace because of his "mental state."  (*Id.*)  At the end of the conference call, Plaintiff was presented with an ultimatum that unless he agreed to take a leave of absence within 24 hours, then he would be "on the road to termination."  (*Id.* ¶ 16*; see also* Dkt. No. 52-19, Olsen Decl., Ex. 301, Arabatzis Depo. at 92:7-13.)  Mr. Arabatzis explained that the purpose of his ultimatum was to help Plaintiff by forcing him to take time off.  (Dkt. No. 52-19, Olsen Decl., Ex. 301, Arabatzis Depo. at 95:15-96:5.)  At the end of the conversation, Plaintiff agreed to take a leave of absence.  (*Id.* at 96:14-17.)  However, Plaintiff was allowed to continue working for another day and a half so that Plaintiff could communicate to staff about his leave and tie up any remaining issues.  (*Id.* at 103:8-105:8; 108:5-18.)  In that call, Mr. Arabatzis also mentioned that Plaintiff would need to undergo a fitness for duty exam ("FFD") before returning to work.  (*Id.* at 108:20- 109:4.)

On January 14, 2021, the next day, Plaintiff was granted his request for medical leave from January 15, 2021 through February 10, 2021 with a doctor's note from Dr.

James Schultz ("Dr. Schultz").  (Dkt. No. 60-4, Yphantides Decl. ¶ 16; Dkt. No. 51-8, Olsen Decl., Ex. 49.)  On February 10, 2021, Dr. James Schultz extended his medical leave through March 5, 2021.  (Dkt. No. 51-11, Olsen Decl., Ex. 52.)

**E.    Dr. Yphantides' Second Medical Leave – January 14, 2021 to March 5, 2021**

While on leave, during January 22 and 23, 2021, Plaintiff communicated with Dr. Denise Foster, the Chief Nursing Officer, who was a co-worker and was in charge of the COVID vaccine distribution for the County, seeking assistance to help his friend schedule a vaccine appointment in exchange for wine.  (Dkt. No. 60-4, Yphantides Decl. ¶ 17[8]; Dkt No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 80:23-81:22; 151:7-24; Dkt. No. 46-3, Klekowski Decl., Ex. 258, Foster Depo. at 43:6-49:13; 50:12-21; Dkt. No. 46-3, Klekowski Decl., Ex. 260, Robbins-Meyer Depo. at 31:18-32:8; 35:23-36:14.).)  At the time of the call, Plaintiff did not know if his friend was eligible to receive the vaccine or not.  (Dkt. No. 60-4, Yphantides Decl. ¶ 17.)  Plaintiff explains that because Dr. Foster had suggested that when Plaintiff's mother had difficulty scheduling a vaccine, he should have reached out to her for help.  (*Id.*)  Despite Plaintiff's repeated requests, Dr. Foster told him she could not help him because his friend was not eligible for the vaccine.  (Dkt. No. 46-3, Klekowski Decl., Ex. 258, Foster Depo. at 43:6-49:13; 50:12-21.)  Dr. Foster reported Plaintiff's conduct to Ms. Evers and Mr. Macchione sometime in February 2021 because even though she was aware of his mental health issues and his hyperactivity, she felt his request was illegal and unethical and wanted to make sure it did not happen again.  (Dkt. No. 46-3, Klekowski Decl., Ex. 258, Foster Depo. at 39:22-25; 74:17-75:23; 85:1-86:16.)

At his deposition, Plaintiff testified that he showed poor judgment by sharing a lot of personal information to Dr. Foster about his friend instead of just asking for assistance.  (Dkt. No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 81:1-22.)  Plaintiff also

---

[8] In his declaration, Plaintiff cites to Exhibit 76 which are the text messages with Dr. Foster; however, that exhibit is not in the record.  (Dkt. No. 60-4, Yphantides Decl. ¶ 17.)

explained that during the interaction with Dr. Foster, he was probably hypomanic because he shared a lot of information about the individual.  (Dkt No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. 81:9-22.)  Dr. Anthony Reading, Plaintiff's psychologist expert, testified that his interaction with Dr. Foster demonstrated Plaintiff displayed mania or hypomania by being garrulous and exhibited lack of insight and lack of judgment.  (Dkt. No. 63-10, Olsen Decl., Ex. 312, Dr. Reading Depo. at 54:2-55:1.)

**F.    Dr. Yphantides' Attempt to Return from Medical Leave and Administrative Leave, March 8, 2022 – March 22, 2022**

Because his FMLA/CFRA leave would be exhausted on March 5, 2021, on March 2, 2021, Plaintiff notified Mr. Arabatzis and Ms. Evers that he intended to return to work on Monday, March 8, 2021. (Dkt. No. 60-4, Yphantides Decl. ¶ 18.)  Late on Friday, March 5, 2021, he received a call from Ms. Evers, Mr. Arabatzis and Mr. Macchione and was told he was not allowed to return to work unless he passed a fitness for duty test or psychological evaluation by County doctors and he would be placed on a paid, non-disciplinary administrative leave starting March 8, 2021 until the results were received. (*Id.* ¶ 19; Dkt. No. 46-3, Klekowski Decl., Ex. 7.)

While on leave, Plaintiff was told not to contact anyone at the County.[9]  (Dkt No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo at 169:13-15.)  But the restriction was not a gag order on him.  (Dkt. No. 53-1, Olsen Decl., Ex. 303, Evers Depo. at 242:4-243:7.)  Mr. Arabatzis explained the purpose of the no contact employee rule during his leave was meant to keep Plaintiff away from work so he could get better.  (Dkt. No. 52-9, Olsen Decl., Ex. 301, Arabatzis Depo. at 179:9-180:15.)  He intended the "no contact" rule to apply to business matters and did not prohibit social interactions although he advised it was not advisable because Plaintiff needed to get better.  *(Id.)*

---

[9] The Court notes that Defendant's SSUF No. 8 stating that he was not to "contact employees of the County until it has been cleared by Kimberly Evers" is not supported by the cited evidence, Exhibit 7 or Plaintiff's deposition.  Moreover, the Evers' deposition pages of 232-233 are not in the record.

**G.    Events Leading to Dr. Yphantides' Termination**

    **1.    Interactions with Jessica Gall**

On March 10, 2021, Defendant learned of the text and Facebook messages exchanged between Jessica Gall ("Ms. Gall") and Plaintiff between January to March 2021 when she reported them to the County.  (Dkt. No. 46-3, Klekowski Decl., Ex. 257, Evers Depo. at 316:23-317:24: 318:9-19; Dkt. No. 46-3, Klekowski Decl., Ex. 97.)  Ms. Gall, a nurse, was part of Plaintiff's staff about three steps below him on the chain of command.  (*Id.* at 158:3-15.)

While Plaintiff was on leave, Ms. Gall initially reached out to see how he was doing in January 2021, and they started communicating through Facebook Messenger and text messages in January, February and March 2021.  (Dkt No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 86:4-10; 158:16-25; Dkt. No. 51-23, Olsen Decl., Ex. 72.)

Plaintiff would send text messages at different times during the day and evening. (Dkt. No. 51-23, Olsen Decl., Ex. 72.)  In these communications, Plaintiff recited Ms. Gall's personal identifying information and then asked personal questions, made jokes about race and gender, recited scripture verses, critiqued County leadership on the COVID response, asked Ms. Gall to relay a message to her neighbor who was the Mayor of San Marcos, and made repeated requests to talk by phone after she had already declined.  (*Id.*; Dkt. No. 46-3, Klekowski Decl., Ex. 97; Dkt. No. 46-3, Klekowski Decl., Ex. 102; Dkt No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 160:18-21; 161:2-18; 188:8-189:20; 191:7-15; 166:7-167:6.)  He also had a phone call with Ms. Gall on February 27, 2021 through Facebook Message.  (Dkt No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 163:16-169:9.)  Plaintiff later messaged her on March 5, 6, 7 and 10 even though he was instructed not to reach out to any County employees.  (*Id.* at 169:10-22; Dkt. No. 46-3, Ex. 97.)  When Ms. Gall reported the interactions with Plaintiff to Ms. Evers on March 10, 2021, Ms. Gall stated she felt uncomfortable with Plaintiff but not sexually harassed.  (Dkt. No. 46-3, Klekowski Decl., Ex. 257, Evers Depo. at 318:11-19.)

21cv1575-GPC(BLM)

1  Plaintiff admitted that he showed poor judgment with his personal interactions that

2  would be deemed inappropriate with Ms. Gall.  (Dkt No. 46-3, Klekowski Decl., Ex. 252,

3  Yphantides Depo. at 79:18-80:2.)  Based on his texts and Facebook messages, Plaintiff

4  believes he was in a hypomanic state at the time of his interactions with Ms. Gall.   (Dkt

5  No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 85:25-86:3.)

6  **2.      Interactions with Rebecca Jones, Mayor of San Marcos**

7  On March 11, 2021, the County learned about Plaintiff's interactions with Rebecca

8  Jones, Mayor of San Marcos that occurred on March 7, 2021 on Facebook messenger and

9  on a Facebook call.  (Dkt. No. 53-2, Olsen Decl., Ex. 304, Brazeau Depo. at 202:6-21;

10  Dkt. No. 51-25, Olsen Decl., Ex. 75; Dkt. No. 52-12, Olsen Decl., Ex. 188.)  On March 7,

11  2021, on Facebook messenger, he made comments such as "I hope your boy toy on

12  Viagra has weapons" and "TMI. . . I'm not talking about the BB gun between his thighs."

13  (Dkt. No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 175:2-18.)  He also stated

14  he knows where she lives.  (*Id.*)  Shortly thereafter, she blocked him on Facebook.  (*Id.* at

15  178:17-19.)  Then Plaintiff sent text messages to Mayor Jones even after she blocked him

16  on Facebook.  (Dkt. No. 46-3, Klekowski Decl., Ex. 100.)  Plaintiff admitted that he

17  showed poor judgment with his banter communications that he had with Mayor Jones on

18  March 7, 2021.  (Dkt. No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 82:4-9.)

19  During a phone call with Ms. Evers and Ms. Brazeau, Mayor Jones explained that

20  as to Plaintiff's call, "she answered because based on his messages he seemed lonely and

21  she regularly speaks to constituents who are struggling with mental deterioration and

22  need someone to talk to and 'virtually hold hands.'"  (Dkt. No. 53-2, Olsen Decl., Ex.

23  304, Brazeau Depo. at 202:6-21; Dkt. No. 51-25, Olsen Decl., Ex. 75.)  Mayor Jones

24  reported that Plaintiff may be struggling with a mental deterioration and was not doing

25  well.  (Dkt. No. 53-2, Olsen Decl., Ex. 304, Brazeau Depo. at 202:6-21 at 202:22-203:1;

26  203:14-24; Dkt. No. 52-12, Olsen Decl., Ex. 188.)  In the end, there was no specific

27  finding that Plaintiff's conduct violated any policy or rule of the County.  (Dkt. No. 53-2,

28  Olsen Decl., Ex. 304, Brazeau Depo. at 197:25-198:9.)

21cv1575-GPC(BLM)

1   Plaintiff responds that he was still hypomanic in March 2021 even though it was
2   less severe.  (Dkt. No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 86:11-23.)
3   Dr. Reading agreed that the Mayor Jones incident along with everything else that was
4   going on, Plaintiff was suffering from manic or hypomanic behavior.  (Dkt. No. 53-10,
5   Olsen Decl., Ex. 312, Reading Depo. at 59:18-23.)

6   **3.     March 15, 2021 Dr. Printz Letter and Fitness For Duty Test**

7       On March 15, 2021, Plaintiff's treating psychiatrist, Dr. David Printz ("Dr.
8   Printz"), wrote a letter in response to the County's request to certify that Plaintiff is
9   capable of performing his job duties.  (Dkt. No. 46-3, Klekowski Decl., Ex. 82.)  He
10  wrote the letter for purposes of Plaintiff's ability to return to work and not concerning
11  any accommodations he might need once he returned.  (Dkt. No. 53-11, Olsen Decl., Ex.
12  313, Printz Depo. at 70:11-17.)  He stated that he discussed with Plaintiff about easing
13  back into work and not to get overwhelmed and he would have supported any
14  accommodations such as part-time work.  (*Id.* at 69:4-25.)  Dr. Printz also testified that
15  Plaintiff's disability can be stabilized and he can function and perform duties of a CMO
16  with treatment and medication, and in fact, Plaintiff became stable in May 2021.  (*Id.* at
17  71:25-72:14.)

18      In the March 15, 2021 letter, Dr. Printz wrote that Plaintiff has been under his care
19  since October 21, 2020 as a referral for treatment of a major depressive episode.  (Dkt.
20  No. 46-3, Klekowski Decl., Ex. 82.)  With treatment and visits, Plaintiff came out of his
21  depression and was able to return to work on November 17, 2020 and has continued to
22  meet with Plaintiff who has stably returned to his baseline mood.  (*Id.*)  He concluded
23  that at the current time, "I can detect no clear psychiatric syndrome or disorder that would
24  impair the ability of Dr. Yphantides to perform his duties as the Chief Medical Officer of
25  San Diego County."  (*Id.*)

26      On March 16, 2021, Plaintiff appeared for the FFD examination but the County
27  doctor refused to proceed because Plaintiff insisted on recording the examination even
28  though he had previously informed the County of his intent to do so and the County never

objected to the recording.  (Dkt. No. 60-4, Yphantides Decl. ¶ 20; Dkt. No. 51-18, Olsen Decl., Ex. 66; Dkt. No. 53-1, Olsen Decl., Ex. 303, Evers Depo. at 289:22-290:24.)

### 4.    Termination

The decision to terminate Plaintiff was done in consultation with Mr. Arabatzis, Mr. Macchione, County's counsel, human resources and Helen Robbins-Meyer, Chief Administrative Officer.  (Dkt. No. 46-3, Klekowski Decl., Ex. 259, Macchione Depo. at 78:25-79:20.)  The County decided to terminate Plaintiff on March 19, 2021 and notified Plaintiff on March 22, 2021.  (Dkt. No. 46-4, Evers Decl. ¶ 3.)

Plaintiff was terminated based on the following three incidents: 1) the Dr. Foster incident where Plaintiff asked if she could arrange a vaccination appointment in January 2021 for a personal friend who was not yet eligible, 2) the inappropriate discussions and text messages Plaintiff had with Jessica Gall, his subordinate in January and February 2021, and 3) inappropriate text messages he had with the Mayor of San Marcos on March 7, 2021.  (Dkt. No. 46-3, Klekowski Decl., Ex. 260, Robbins-Meyer Depo. at 31:18-32:16; 33:11-23; Dkt. No. 46-3, Klekowski Decl., Ex. 259, Macchione Depo. at 88:13-89:4; 90:5-20; 91:9-17.)  These three incidents violated the County of San Diego's Code of Conduct and San Diego Code of Ethics.[10]  (Dkt. No. 46-3, Klekowski Decl., Ex. 259, Macchione Depo. at 96:20-97:1; Dkt. No. 46-3, Klekowski Decl., Ex. 256, Brazeau Depo. at 196:19-197:4.)

On March 22, 2021, Ms. Brazeau wrote to Plaintiff acknowledging that the FFD test on March 16, 2021 was cancelled because the evaluator said the session could not be recorded and informed that Plaintiff's attorney shared the contents of Dr. Printz' March 15, 2021 letter.  (Dkt. No. 46-3, Klekowski Decl., Ex. 95.)  Based on Dr. Printz' conclusion that Plaintiff is capable of returning back to work, the County canceled any

---

[10] However, Ms. Brazeau testified that the conduct with regards to Mayor Jones did not violate any policy or rule of the County only that the interactions with Dr. Foster and Ms. Gall were violations of the County Code of Ethics and Code of Conduct.  (Dkt. No. 46-3, Klekowski Decl., Ex. 256, Brazeau Depo. at 196:19-197:4; 197:25-198:9.)

14

further evaluation.  (*Id.*)  On the same day, he also received another letter terminating his employment.  (Dkt. No. 60-4, Yphantides Decl. ¶ 21.)

Since his termination, Plaintiff has worked as a project consultant for Palomar Health and Palomar Health Medical Group.  (*Id.* ¶ 23.)  He is currently the President-Elect of the San Diego County Medical Society and serves on the board of several organizations.  (*Id.*)  In August 2021, he was awarded with the James T. Hay, MD Award by the San Diego County Medical Society Executive Committee.  (*Id.*)

**Discussion**

**A.    Legal Standard on Federal Rule of Civil Procedure 56**

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material when it affects the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact.  *Celotex Corp.,* 477 U.S. at 323.  The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial.  *Id.* at 322-23.  If the moving party fails to bear the initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions

on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

**B.** *Fourth Cause of Action* **- Failure to Provide Reasonable Accommodation – Gov't Code section 12940(m);** *Fifth Cause of Action* **- Failure to Engage in the Interactive Process, Gov't Code section 12940(n)**

Plaintiff has alleged claims against Defendant for failure to provide reasonable accommodations and failure to engage in the interactive process under FEHA. (Dkt. No. 1, Compl. ¶¶ 59-81.)

FEHA makes it unlawful "for an employer . . . to fail to make reasonable accommodation for the *known* physical and mental disability of an applicant or employee" as long as it does not create an undue hardship on the employer's operations. Cal. Gov't Code § 12940(m) (emphasis added). The elements of a prima facie claim for failure to make reasonable accommodations are: "(1) the plaintiff has a disability under the FEHA; (2) the plaintiff is qualified to perform the essential functions of the position; and (3) the employer failed to reasonably accommodate the plaintiff's disability." *Scotch v. Art Inst. of Cal.-Orange Cnty., Inc.*, 173 Cal. App. 4th 986, 1009-10 (2009) (citation omitted). "Reasonable accommodation" means a "modification or adjustment to the workplace that enables a disabled employee to perform the essential functions of the job held or desired." *Nadaf–Rahrov v. Neiman Marcus Grp., Inc.*, 166 Cal. App. 4th 952, 974 (2008).

Under the FEHA, possible reasonable accommodations include job restructuring, offering part-time or modified work schedules or reassigning to a vacant position or "other similar accommodations for individuals with disabilities."  Cal. Gov't Code § 12926(p)(2).  "'[A] reasonable accommodation can include providing the employee accrued paid leave or additional unpaid leave for treatment . . .' provided it is likely that, at the end of such leave, the employee will be able to perform his or her employment duties."  *Wilson v. Cnty. of Orange*, 169 Cal. App. 4th 1185, 1193-94 (2009) (quoting *Hanson v. Lucky Stores, Inc*., 74 Cal. App. 4th 215, 226 (1999)).  A reasonable accommodation does not, however, "require the employer to wait indefinitely for an employee's medical condition to be corrected."  *Hanson*, 74 Cal. App. 4th at 226–27 (internal quotation marks and citation omitted).

The FEHA also makes it unlawful for an employer to "fail to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition."  Cal. Gov. Code § 12940(n).  "The 'interactive process' required by the FEHA is an informal process with the employee or the employee's representative, to attempt to identify a reasonable accommodation that will enable the employee to perform the job effectively."  *Scotch*, 173 Cal. App. 4th at 1013 (citation omitted).  "The employee must initiate the process unless the disability and resulting limitations are obvious."  *Id.*

An employee is not required to specifically invoke the protections of FEHA or speak any "magic words" in order to effectively request an accommodation under the statute.  *See Gelfo v. Lockheed Martin Corp*., 140 Cal. App. 4th 34, 62 n.22 (2006) ("Although it is the employee's burden to initiate the process, no magic words are necessary, and the obligation arises once the employer becomes aware of the need to consider an accommodation."); *Avila v. Continental Airlines, Inc*., 165 Cal. App. 4th 1237, 1252 (2008) ("no particular form of request is required").  "Once the interactive

17

process is initiated, the employer's obligation to engage in the process in good faith is continuous." *Scotch*, 173 Cal. App. 4 at 1013.  While a claim for failure to accommodate and failure to engage in the interactive process are separate causes of action, "each necessarily implicates the other."  *Gelfo*, 140 Cal. App. 4th at 54 ("[t]wo principles underlie a cause of action for failure to provide a reasonable accommodation. First, the employee must request an accommodation. . . . Second, the parties must engage in an interactive process regarding the requested accommodation and, if the process fails, responsibility for the failure rests with the party who failed to participate in good faith. . . .").

"When a claim is brought for failure to reasonably accommodate the claimant's disability, the trial court's ultimate obligation is to isolate the cause of the breakdown . . . and then assign responsibility so that [l]iability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown." *Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 261 (2000) (quoting *Barnett v. U.S. Air., Inc*., 228 F.3d 1105, 1115 (9th Cir. 2000), *vacated on other grounds by U.S. Airways, Inc. v Barnett*, 535 U.S. 391 (2002) (internal quotations omitted).  Thus, "the employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts that . . . the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." *Id.* at 263.

Here, Defendant argues that its duty to accommodate and engage in the interactive process was never triggered because when Plaintiff returned to work in November 2020, he and his doctors did not request an accommodation.  (Dkt. No. 61 at 31.)  The County continues that it was Plaintiff who had the duty to request the accommodation and engage in the interactive process which he failed to do.  (*Id.*)  Plaintiff responds that the breakdown of the County's engagement began in November 2020 when he returned from medical leave and, despite the County's knowledge of his major depression, it did not

attempt to accommodate him or engage in the interactive process.  (Dkt. No. 60 at 36.)
He then identifies a second breakdown on January 13, 2021 when Defendant provided
Plaintiff with an ultimatum of taking a forced leave or face termination before exploring
other accommodations.  (*Id.*)  Finally, the third breakdown occurred on March 5, 2021
when the County forced him to remain on administrative leave without engaging in the
interactive process and required him to undergo a FFD exam.  (*Id.* at 36-37.)

   To face liability under section 12940(m), an employer must have been aware of the
employee's disability.  *King v. United Parcel Serv., Inc*., 152 Cal. App. 4th 426, 443
(2007) ("[The] employee can't expect the employer to read his mind and know he secretly
wanted a particular accommodation and sue the employer for not providing it. Nor is an
employer ordinarily liable for failing to accommodate a disability of which it had no
knowledge.") (quoting *Prilliman v. United Air Lines, Inc.,* 53 Cal. App. 4th 935, 954
(1997)).  In general, the employee must initiate the process "unless the disability and
resulting limitations are obvious."  *Scotch,* 173 Cal. App. 4th at 1013 ("Where the
disability, resulting limitations, and necessary reasonable accommodations, are not open,
obvious, and apparent to the employer, . . . the initial burden rests primarily upon the
employee . . . to specifically identify the disability and resulting limitations, and to
suggest the reasonable accommodations.") (citation omitted).  Moreover, an "employer
also has no duty to accommodate an employee who denies she [or he] has a disability or
denies a need for accommodation."  *Prilliman*, 53 Cal. App. 4th at 954 (citation omitted).
However, once an employer becomes aware of an employee's disability, it has an
affirmative duty to make reasonable accommodations even if the employee has not
requested an accommodation.  *Gardner v. Fed. Express Corp*., 114 F. Supp. 3d 889, 901
(N.D. Cal. 2015) (citing 2 Cal. Code Reg. § 11068(a)[11]; *Prilliman*, 53 Cal. App. 4th at

---

[11] "(a) Affirmative Duty. An employer or other covered entity has an affirmative duty to make
reasonable accommodation(s) for the disability of any individual applicant or employee if the employer
or other covered entity knows of the disability, unless the employer or other covered entity can

21cv1575-GPC(BLM)

954 (rejecting argument that a "disabled employee must first come forward and request a specific accommodation before the employer has a duty to investigate such accommodation")).  "FEHA's reference to a 'known' disability is read to mean a disability of which the employer has become aware, whether because it is obvious, the employee has brought it to the employer's attention, it is based on the employer's own perception-mistaken or not-of the existence of a disabling condition or, perhaps as here, the employer has come upon information indicating the presence of a disability." *Gelfo*, 140 Cal. App. 4th at 61 n. 21.  Once aware, the employer has an affirmative duty to reasonably accommodate, which is not extinguished by one effort. *Swanson v. Morongo Unified Sch. Dist*., 232 Cal. App. 4th 954, 969 (2014).

In this case, it is undisputed that Plaintiff did not seek any accommodations when he returned to work on November 16, 2020 or provide a doctor's note stating he had a medical impairment affecting his ability to perform his job or needed accommodations, nor did he deny he had a disability or needed any accommodations.  However, Plaintiff testified that he initially reached out to his supervisor, Mr. Arabatzis, in August 2020, informing him about his high stress level due to work, and when his condition worsened, he took leave in October 2020.  Prior to taking leave, Plaintiff called each of his seven "direct reports" explaining that he was taking leave because he was "struggling."  Then, when he returned from medical leave, in November or December 2021, Plaintiff directly informed Mr. Arabatzis, Ms. Evers, and Mr. Pease about the reasons why he was on medical leave which included his depression and suicidal ideation.  By January 2021, Plaintiff also specifically asked Mr. Arabatzis, repeatedly, for assistance in reducing his workload responsibilities but nothing was done.[12]

---

demonstrate, after engaging in the interactive process, that the accommodation would impose an undue hardship."  2 Cal. Code Reg. § 11068(a).

[12] Plaintiff also testified that when he asked Mr. Arabatzis and Mr. Macchione, when the issue was punted to him, for help with unloading his administrative responsibilities, he did not tell them that he made the request due to his mental health condition.  (Dkt. No. 52-18, Olsen Decl., Ex. 300, Yphantides

Because Plaintiff has shown that his supervisor and colleagues were directly informed of his mental breakdown due to the excessive work hours and high level of stress in his position as CMO which required him to take medical leave, he has raised a triable issue of fact whether Defendant's duty to engage in the interactive process and offer reasonable accommodations were triggered.[13]  *See Humphrey v. Mem'l Hosp. Ass'n.*, 239 F.3d 1128, 1137 (9th Cir. 2001) ("Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA [and FEHA[14]] to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations.").

Defendant contends that the failure to accommodate claim fails because he was provided with every accommodation he requested during his employment in October-November 2020 and January 15-March 5, 2021.[15]  (Dkt. No. 61 at 31.)  However, once the duty to accommodate and engage in the interactive process are triggered, the duties are continual and not exhausted after one attempt.  *See Humphrey,* 239 F.3d at 1137 ("the duty to accommodate is a continuing one that is not exhausted by one effort. . . . [T]he employer's obligation to engage in the interactive process extends beyond the

---

Depo. at 116:4-14.)  However, even if Plaintiff had not specifically asked for assistance due to his mental health condition, they were still on notice that he had mental health issues in January 2021.

[13] Because Plaintiff has raised an issue of fact as to whether Defendant failed to accommodate and failed to engage in the interactive process at the first breakdown in November/December 2020, Defendant's summary judgment must be denied.  The Court need not address the second and third alleged breakdowns because the duties imposed on Defendant is a continual one and no evidence has been provided that Defendant engaged in the interactive process or offered or provided reasonable accommodations besides granting Plaintiff's request for medical leave in October 2020 and possibly in January 2021.

[14] In *Humphrey*, the Ninth Circuit noted that "[b]ecause the FEHA provisions relating to disability discrimination are based on the ADA, decisions interpreting federal anti-discrimination laws are relevant in interpreting the FEHA's similar provisions. . . .We analyze Humphrey's state and federal disability claims together, relying on federal authority in the absence of contrary or differing state law." *Humphrey*, 239 F.3d at 1133.

[15] Defendant also asserts it provided Plaintiff with accommodations by granting his request for medical leave in 2018.  (Dkt. No. 61 at 31.)  However, Defendant does not provide evidence to support the request in 2018 and whether that request is related to the issues in this case.

first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed.").  Further, "the reasonableness of an accommodation is an issue for the jury." *Prilliman*, 53 Cal. App. 4th at 954.

Here, even though Defendant granted his request for accommodation for medical leave in October 2020, if the accommodations were not effective, there remains a question of fact whether Defendant had a continuing duty to offer further accommodations once it became aware of the extent of Plaintiff's mental issues in November/December 2020 to enable him to perform the essential duties of the CMO. The record shows that when Plaintiff returned from protected leave in mid-November 2020, he resumed his duties as a CMO with the same duties and heavy workload as when he left his position in mid-October.  With COVID-19 peaking in November/December, he resumed a heavy workload, working through the night, working weekends, and through the December holiday.  Plaintiff has raised an issue of fact as to whether further accommodations and/or the need to further engage in the interactive process were necessary once he returned from leave and his mental disability became known.

Further, Plaintiff testified that in January 2021, he repeatedly asked Mr. Arabatzis for help with administrative responsibilities because of the immense burden created by handling his normal CMO job duties and responding to the COVID-19 health crisis. Rather than accommodate the request for support, Plaintiff asserts that Mr. Arabatzis punted the issue to Mr. Macchione without accommodating Plaintiff's request for help. Certainly, these facts presents a genuine issue of fact on the accommodations and interactive process claims.

Accordingly, the Court DENIES Defendant's motion for summary judgment on the fourth cause of action for failing to provide reasonable accommodations and fifth cause of action for failing to engage in the interactive process under the FEHA.

/ / /

/ / /

21cv1575-GPC(BLM)

**C.**     *Third Cause of Action* **- Disability Discrimination under FEHA, Cal. Gov't Code section 12940(a)**

Defendant contends the claim for disability discrimination under California Government Code section 12940(a) fails because Plaintiff has not made a prima facie showing that he was able to competently perform the essential duties of a CMO by failing to exercise good judgment in his interactions with a County employee, a subordinate and a publicly elected official.  (Dkt. No. 61 at 23-24.)  Plaintiff does not directly respond to the County's argument that he did not exercise "good judgment" but instead contends he was competently able to carry out the duties of the CMO, as reflected in his annual performance reviews through September 2020, his discipline-free record and despite being in a hypomanic state in January 2021, he carried out high-profile tasks.  (Dkt. No. 60 at 34-35.)  He appears to implicitly contend that his mental state resulting in his lack of good judgment could have been accommodated until he returned to his baseline mood, and therefore, he was and remains qualified to perform the CMO's job duties.  (*Id.*)

Under California's Fair Employment and Housing Act ("FEHA"), it is unlawful for an employer "to discriminate against the [employee] in compensation or in terms, conditions, or privileges of employment" due to the employee's physical or mental disability.  Cal. Gov't Code § 12940(a).  But, FEHA "does not prohibit an employer from . . . discharging an employee with a physical or mental disability . . . where the employee, because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations . . . ."  Cal. Gov't Code § 12940(a)(1); *Green v. State of Cal.*, 42 Cal. 4th 254, 257 (2007) ("The FEHA prohibits discrimination against any person with a disability but, like the ADA, provides that the law allows the employer to discharge an employee with a physical disability when that employee is unable to perform the essential duties of the job even with reasonable accommodation.").

To establish a prima facie case of disability discrimination under FEHA, a plaintiff must show "(1) he suffers from a disability; (2) he is otherwise qualified to do his job;

and, (3) he was subjected to adverse employment action because of his disability." *Faust v. Cal. Portland Cement Co.*, 150 Cal. App. 4th 864, 886 (2007).  On the second factor, the plaintiff has the burden and "must demonstrate that he or she was qualified for the position sought or held in the sense that he or she is able to perform the essential duties of the position with or without reasonable accommodation." *Green*, 42 Cal. 4th at 260, 267. "The employee's burden of proving a prima facie case is not onerous, and very little evidence is required at this step." *Zamora v. Sec. Indus. Specialists, Inc*., 71 Cal. App. 5th 1, 38 (2021) (addressing FEHA disability discrimination claim).

"For purposes of the ADA [and FEHA], with a few exceptions, conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." *Humphrey*, 239 F.3d at 1139-40 (citing *Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1086 (10th Cir. 1997)). "The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability." *Id.* at 1140; *see also Borkowski v. Valley Cent. Sch. Dist*., 63 F.3d 131, 143 (2nd Cir. 1995) ("Failure to consider the possibility of reasonable accommodation for [known] disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities.").

"Essential duties" are defined as "the fundamental job duties of the employment position of the individual with a disability holds or desires."  Cal. Gov't Code § 12926(f)(1).  In this case, the CMO acts as the "health steward for the population of San Diego County" and the essential duties of a CMO include overseeing the medical care services division; serving as the Director of the County's EMS system; overseeing the Healthy San Diego (Medi-Cal) initiative; engaging in health information exchange; promoting the Live Well San Diego project; supervising the Chief Nursing Officer, Chief Pediatric Officer, Chief Dental Officer, and Chief Pharmacy Officer; mentoring and supporting HHSA managers and executives; engaging with agencies and the community; and working with public and community partners to bring about the County's health

initiatives.[16]  (Dkt. No. 46-3, Klekowski Decl., Ex. 252, Yphantides Depo. at 31:2-37:1; 38:12-25.)  The CMO position also involves mentoring subordinates, earning the respect of subordinates as well as working with political leaders, at the local, state and national level, and with hospitals, physician leaders, faith leaders, insurance leaders, not-for-profit leaders, technology leaders and philanthropic leaders.  (*Id.* at 22:19-23:4; 43:10-12; 53:22-54:13.)  The CMO is a high-level executive position requiring a higher ethical and moral standard.  (*Id.* at 42:23-43:13.)  With the onset of the COVID-19 pandemic, Plaintiff's essential duties changed and, in fact, increased and he became part of the policy-making body concerning the County's response to COVID-19 and was actively involved in the Emergency Operations Center ("EOC").  (*Id.* at 37:21-41:1; 114:19-24.)  As such, his public role increased, collaboration with community partners dramatically increased and his work with County employees outside his chain of command increased.  (*Id.* at 37:21-41:1.)

Here, Defendant does not challenge the ability of Plaintiff to perform the day-to-day essential duties of the CMO as it is not disputed that he had a discipline-free and stellar work history through September 2020, his last annual performance review.  Instead, the County argues he was not qualified to carry out the essential duties of a CMO because he failed to exercise "good judgment" based on his interactions with Dr. Foster, a colleague, Jessica Gall, a subordinate, and Rebecca Jones, Mayor of San Marcos during January to March 2021.  While it is not disputed that Plaintiff engaged in behavior that was not suitable of a CMO in January to March 2021, Plaintiff argues that his lack of good judgment was a result of his hypomania which was a part of his disability at that time.  Defendant replies that Plaintiff cannot conjure up a "post-hoc epiphany" that he was suffering from an undiagnosed and undisclosed "hypomanic" episode when he, Dr.

---

[16] Defendant relies on Plaintiff's description of the essential duties of a CMO.

Schutz, and Dr. Printz stated he was able to return to work without any restrictions or accommodations.  (Dkt. No. 62 at 8.)

Whether Plaintiff realized his hypomanic state after the fact or not, the issue is whether he was qualified to perform the essential duties of the CMO with or without reasonable accommodations.  *Green*, 42 Cal. 4th at 260, 267.  While an employer's failure to accommodate and engage in the interactive process are distinct causes of action from a disability discrimination claim, they are components of disability discrimination claim and may be considered if all three have been alleged in the complaint, as they have in the instant complaint.  *See Zamora,* 71 Cal. App. 5th at 39-40.  As discussed above, a mandatory duty to accommodate arises when the disability and resulting limitations are obvious, is based on the employer's own perception, or the employer has come upon information indicating the presence of a disability.  *See Scotch* 173 Cal. App. 4th at 1013; *Gelfo*, 140 Cal. App. 4th at 61 n. 21.  Reasonable accommodations include job restructuring, offering part-time or modified work schedules, reassigning to a vacant position, or providing extended paid or unpaid leave as long as the employee will be able to perform his duties at the end of the leave.  *See* Cal. Gov't Code § 12926(p)(2); *Wilson,* 169 Cal. App. 4th at 1193-94.

Here, as discussed above, even though Plaintiff and his physicians did not seek an accommodation when he returned from his leave, Plaintiff has raised an issue of fact whether Defendant was aware of his disability and limitations in November/December 2020 triggering its mandatory duty to accommodate and whether Defendant failed to accommodate Plaintiff's request for assistance and work support in January 2021.  Consequently, Plaintiff has raised an issue of fact whether he could perform the essential duties of the CMO with accommodations.

Further Dr. Printz testified that Plaintiff's disability could be stabilized and he could perform the duties of a CMO with treatment and medication, and in fact, Plaintiff became stable in May 2021.  (Dkt. No. 53-11, Olsen Decl., Ex. 313, Printz Depo. at 71:25-72:14.)  Moreover, the fact that Plaintiff is currently employed as a consultant with

Palomar Health and Palomar Health Medical Group, is the President-elect of the San Diego Medical Society, and was awarded with the James T. Hay, MD Award by the SDCMS Executive Committee in August 2021 raises an issue of fact whether he would have been able to perform the essential duties of a CMO with accommodations.  *See Villalobos v. TWC Admin. LLC*, 720 Fed. App'x 839, 841 (9th Cir. 2017) (plaintiff is not qualified simply because he was unable to work at the time of his termination and "one form of reasonable accommodation can be an extended leave of absence, that will, in the future, enable an individual to perform his essential job duties."); *Nunes v. Wal-Mart Stores, Inc*., 164 F.3d 1243, 1247 (9th Cir. 1999) (error to focus on the plaintiff's disability during the period of her medical leave because ADA requires that the plaintiff be able to perform the essential functions of her job "with or without reasonable accommodation.").  Thus, the Court DENIES Defendant's motion for summary judgment on the third claim for disability discrimination under FEHA.

**D.**   *Sixth Cause of Action* **– Retaliation for Requesting Disability Accommodations, Gov't Code section 12940(m)(2);** *Ninth Cause of Action* **- Retaliation for Taking Medical Leave, Gov't Code section 12945.2** *et seq***. and** *Eleventh Cause of Action* **– Retaliation for Taking Medical Leave, 28 U.S.C. 2601** *et seq***.**

Plaintiff brings claims for retaliation under the FEHA, CFRA and the FMLA. (Dkt. No. 1, Compl. ¶¶ 82-88; 109-118; 128-137.)

"[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action."  *Yanowitz v. L'Oreal USA, Inc*., 36 Cal. 4th 1028, 1042 (2005).  Seeking an accommodation of a disability qualifies as a protected activity.  *See* Cal. Gov't Code § 12940(m)(2); *Coons v. Sec'y of U.S. Dept. of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004) (retaliation under the Rehabilitation Act).

The elements of a cause of action for retaliation in violation of CFRA are: "(1) the defendant was an employer covered by CFRA; (2) the plaintiff was an employee eligible to take CFRA leave; (3) the plaintiff exercised her right to take [leave] for a qualifying CFRA purpose; and (4) the plaintiff suffered an adverse employment action, such as termination, fine, or suspension, because of her exercise of her right to CFRA [leave]." *Moore v. Regents of Univ. of Cal.,* 248 Cal. App. 4th 216, 248 (2016) (citation and internal quotations omitted).[17]

Under the FLMA, to make a prima facie showing, a plaintiff must establish that "(1) he engaged in a protected activity under the FMLA; (2) he suffered some adverse employment action by the employer following the protected activity; and (3) the adverse employment action was causally linked to the protected activity."[18]  *Browett v. City of Reno*, 237 F. Supp. 3d 1040, 1046 (D. Nev. 2017); *Schultz v. Wells Fargo Bank, Nat. Ass'n*, 970 F. Supp. 2d 1039, 1059 (D. Or. 2013) (prima facie case "(1) involvement in a protected activity under the FMLA; (2) an adverse employment action; and (3) a causal link between the protected activity and the employment action.").

Plaintiff is required to establish a "causal connection" between him taking statutory-protected medical leave and a request for disability accommodation, and the employment decision at issue to succeed on a retaliation under the CFRA, FMLA and FEHA.  *See Rogers v. Cnty. of Los Angeles*, 198 Cal. App. 4th 480, 491-93 (2011) (discussing CFRA "retaliation" claim); *Bachelder v. America W. Airlines, Inc.,* 259 F.3d 1112, 1125 (9th Cir. 2001) (stating a plaintiff can satisfy her burden of proving that the "taking of FMLA-protected leave constituted a negative factor in the decision to" take an adverse employment action "by using either direct or circumstantial evidence, or both");

---

[17] Under CFRA, "[i]t shall be an unlawful employment practice for an employer to . . . discriminate against, any individual because of . . . (1) [a]n individual's exercise of the right to family care and medical leave provided by [the CFRA]."  Cal. Gov't Code § 12945.2(k)(1).

[18] Under the FMLA, it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  29 U.S.C. § 2615(a)(2).

*Yanowitz*, 36 Cal. 4th at 1042 (FEHA requires a "causal link between the protected activity and the employer's action").

Defendant argues that the retaliation claims under FEHA, the CFRA, and the FMLA fail as a matter of law because Plaintiff cannot establish a causal link between Plaintiff seeking medical leave and his termination because the County encouraged and granted him medical leave whenever he requested them. (Dkt. No. 61 at 25-27.) Plaintiff responds that the temporal proximity between him taking protected medical leave until March 5, 2021, and the County's refusal to allow him to return on March 8, 2021, and his ultimate termination on March 22, 2021 creates a triable issue of fact for the jury. (Dkt. No. 60 at 39.)

In some cases, temporal proximity between the protected activity and an adverse employment action can, by itself, constitute sufficient circumstantial evidence or an inference of retaliation but it must be close in time. *Villiarimo v. Aloha Island Air, Inc*., 281 F.3d 1054, 1065 (9th Cir. 2002) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity."); *Stegall v. Citadel Broadcasting Co*., 350 F.3d 1061, 1067-70 (9th Cir. 2003) (nine days between plaintiff's complaints of discrimination and her termination supports finding of causation); *Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102, 1110 (2007) (inference of a causal nexus between an employee's protected activity and adverse employment action on the basis of temporal proximity permitted if the adverse action follows "within a relatively short time" after the protected activity); *Anderson v. City & Cnty. of San Francisco*, 169 F. Supp. 3d 995, 1028 (N.D. Cal. 2016) ("[T]o support an inference of retaliatory motive based on timing alone, the adverse action must have occurred 'fairly soon after the employee's protected expression.' Causation will only be inferred from timing alone if the proximity is 'very close.'").

However, an inference of causation based on temporal proximity is undermined or negated if intervening events are the reasons for the employer's adverse employment action. *See Fazeli v. Bank of America, NA*, 525 Fed. App'x 570, 571 (9th Cir. 2013)

(prima facie retaliation case under FEHA not met on causation because despite the investigation by the defendant of sexual harassment claims by a subordinate, the plaintiff admitted his own "bad judgment in allowing the subordinate to sleep at his home"); *Zsenyuk v. City of Carson*, 99 Fed. App'x 794, 796 (9th Cir. 2004) (temporal proximity argument undermined because the three incidents of retaliatory conduct took place after he returned from FMLA leave but they stemmed from investigation of plaintiff's conduct before he took leave); *Parker v. Sitel Corp.*, 151 Fed. App'x 535, 537 (9th Cir. 2005) (prima facie case not established for retaliation based on temporal proximity for retaliation because there were other reasons for terminating his employment); *Lee v. Eden Med. Ctr.*, 690 F. Supp. 2d 1011, 1026 (N.D. Cal. 2010) ("This intervening event negates any inference that Plaintiff's complaint caused the subsequent adverse action"); *Keshe v. CVS Pharmacy Inc.*, Case No. 2:14-cv-08418-CAS(MANx), 2016 WL 1367702, at *11 (C.D. Cal. Apr. 5, 2016) ("Because the use of force incident occurred after Keshe took time off and before he was terminated, the timing of Keshe's termination does not support the conclusion that his termination was the result of him taking two days off of work.").

Here, Plaintiff requested and was granted protected leave from October 2020 – November 17, 2020, was encouraged or directed to take leave on January 15, 2021 which was later extended by Plaintiff to March 5, 2021.  Defendant then placed him on paid, administrative leave starting on March 8, 2021 pending completion of a FFD exam demonstrating that he was able to return to his duties as CMO.  On March 22, 2021, Plaintiff was informed that he was terminated.

Plaintiff relies solely on the temporal proximity between March 5, 2021 when he sought to return from protected leave and March 22, 2021, when he was terminated as the only evidence establishing a circumstantial causal link to establish a prima facie case of retaliation.[19]  However, on March 10 and 11, 2021, the County learned about Plaintiff's

---

[19] Plaintiff also summarily argues that Defendant's inconsistent and illegitimate reasons for discharge are circumstantial evidence that it discharged him for exercising his protected rights in seeking an

interactions, that he admitted did not reflect "good judgment", with Ms. Gall, a county employee and subordinate of Plaintiff, and with Mayor Jones, a public official.  The conduct with both women constituted a violation of the County's Code of Conduct and Code of Ethics and resulted in his termination on March 22, 2021.  Therefore, these two incidents negate the inference of causation based on temporal proximity.  As such, Plaintiff has failed to demonstrate a prima facie case that his termination was in retaliation for requesting accommodations or requesting medical leave.  *See Lee*, 690 F. Supp. 2d at 1026.

Moreover, even if temporal proximity established a prima facie showing of causation on retaliation, *see Curley v. City of N. Las Vegas*, 772 F.3d 629, 634 (9th Cir. 2014) (acknowledging that very close temporal proximity between a protected activity and an adverse employment action can be sufficient evidence of a causal link to support a prima facie showing of retaliation"), Defendant has provided legitimate, nondiscriminatory reasons for terminating Plaintiff and Plaintiff cannot show pretext. *See id.* ("new information revealed by [an intervening] investigation defeats any causal inference that might otherwise follow from the temporal proximity between . . . protected activity and . . . termination.").

The three-stage burden-shifting test established by the United States Supreme Court [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)] applies to retaliation claims under FEHA, the CFRA and the FMLA.  *See Yanowitz*, 36 Cal. 4th at 1042; *Moore*, 248 Cal. App. 4th at 248 ("[s]imilar to causes of action under FEHA, the *McDonnell Douglas* burden shifting analysis applies to retaliation claims under CFRA."); *Sanders v, City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011) (acknowledging it is an

---

accommodation and medical leave.  (Dkt. No. 60 at 39.)  Without citation to the record specific to the retaliation claims, the Court declines to comb through the extensive record to search for evidence to support the relation claims.  *See Carmen v. S.F. Unified Sch. Dist.,* 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found.").

open question in the Ninth Circuit but that other circuits apply the *McDonnell Douglas* framework).  If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to identify "a legitimate, nonretaliatory reason for the adverse employment action." *Yanowitz*, 36 Cal. 4th at 1042 (citation omitted).   "Once the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation 'drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation." *Id.*

Courts have held that once the employer provides a legitimate, non-discriminatory reason for terminating the plaintiff, temporal proximity can no longer satisfy the plaintiff's burden of proving evidence that the employer's reason was a pretext and proof of intentional retaliation.  *See Curley*, 772 F.3d at 634 (new information revealed by the City's investigation defeats any causal inference that might otherwise follow from the temporal proximity between his protected activity and his termination); *Hashimoto v. Dalton*, 118 F.3d 671, 680–81 (9th Cir. 1997) (holding that, although "the timing of the[ ] events suffice[d] to establish a minimal prima facie case of retaliation, it d[id] nothing to refute" the employer's stated legitimate reasons for disciplining the plaintiff); *Nadaf–Rahrov v. Neiman Marcus Grp., Inc.*, 166 Cal. App. 4th 952, 990 (2008) (while temporal proximity between protected activity and the employee's subsequent termination may satisfy the causation requirement of establishing a prima facie case since the burden is minimal, "temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination."); *Artega v. Brink's, Inc.*, 163 Cal. App. 4th 327, 353 (2008) ("temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination.").

Here, because Plaintiff's only evidence of causation is temporal proximity, it is not sufficient to show pretext or intentional retaliation.  As such, Plaintiff has not met his burden of establishing a genuine issue of material fact in dispute on causation for the

retaliation claims.  Accordingly, the Court GRANTS Defendant's motion for summary judgment on the sixth, ninth, and eleventh causes of action for retaliation.

**E.**     ***Seventh Cause of Action*** **- Failure to Prevent Discrimination and Retaliation**

Defendant summarily argue that because the underlying discrimination and relations claims fail, the failure to prevent discrimination and retaliation necessarily fails. (Dkt. No. 61 at 30.)   Plaintiff similarly opposes that because he demonstrated that the County discharged him because of his mental disability and failed to prevent discrimination, summary judgment must be denied.  (Dkt. No. 60 at 37.)

The County has an "affirmative and mandatory" duty to prevent discrimination and retaliation under the FEHA.  *Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.*, 103 Cal. App. 4th 1021, 1035 (2002); Gov't Code § 12940(k).

Here, because the Court denies summary judgment on the discrimination claim, the Court also DENIES Defendant's motion for summary judgment on the failure to prevent discrimination cause of action.  However, because the Court grants summary judgment on the retaliation claim, the Court GRANTS Defendant's motion for summary judgment on the failure to prevent retaliation cause of action.  *See Nasser v. AT & T Corp.*, No. C 05-5426 PJH, 2007 WL 1119203, at * 10 (N.D. Cal. Apr. 16, 2007) ("Because the court has found no viable claim of discrimination and that the single incident of harassment is not sufficiently severe and pervasive to be actionable, there can be no independent cause of action for failure to prevent discrimination or harassment under FEHA.") (citing *Trujillo v. N. Cnty. Trans. Dist.*, 63 Cal.App.4th 280, 289 (1998) ("Employers should not be held liable to employees for failure to take necessary steps to prevent such conduct, except where the actions took place and were not prevented.")).

**F.**     ***Eighth Cause of Action*** **– Interference with the Right to Medical Leave – Gov't Code section 12945.2** ***et seq.*** **and** ***Tenth Cause of Action*** **– Interference with the Right to Medical Leave – 29 U.S.C. § 2601** ***et seq.***

Defendant maintains that the causes of action for interference with right to medical leave under federal and state law fail because Plaintiff cannot show a time when the

County denied his right to leave but instead show he was granted leave for every request. (Dkt. No. 61 at 32.)  In response, Plaintiff contends that the interference claims are based on his right to reinstatement under the FMLA and CFRA.  (Dkt. No. 60 at 38.)  He claims that his FMLA/CFRA leave was exhausted on March 5, 2021, and he provided a doctor's note medically clearing him to return to work on March 8, 2021, but Defendant refused to reinstate him and forced him to be on administrative leave.  (*Id.*)  Defendant did not reply to Plaintiff's argument.  (Dkt. No. 57.)

Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1).  Under the CFRA,[20] it is also unlawful "for an employer "to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right provided under [the CFRA.]"  Cal. Gov't Code § 12945.2(q).

In order to present a prima facie failure to reinstate employee claim, an "employee must establish that: (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled."  *Sanders*, 657 F.3d at 778.

"The FMLA creates two interrelated, substantive employee rights: first, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave."  *Id.* at 777 (quoting *Bachelder*, 259 F.3d at 1122)).  "The right to reinstatement guaranteed by 29 U.S.C. § 2614(a)(1)[21] is the linchpin of the entitlement

---

[20] "The CFRA closely parallels its federal counterpart, the Family and Medical Leave Act of 1993 (FMLA) (29 U.S.C. § 2601 et seq.) . . . Because the CFRA and the FMLA contain nearly identical provisions regarding family or medical leave (Gov. Code, § 12945.2, subd. (a); 29 U.S.C. § 2612(a)), California courts routinely rely on federal cases interpreting the FMLA when reviewing the CFRA." *Rogers v. Cnty. of Los Angeles*, 198 Cal. App. 4th 480, 486-87 (2011) (citation omitted).

[21] "An eligible employee who takes leave  . . . shall be entitled, on return from such leave--(A) to be restored by the employer to the position of employment held by the employee when the leave

theory because 'the FMLA does not provide leave for leave's sake, but instead provides leave with an expectation that an employee will return to work after the leave ends.'" *Id.* at 778 (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)).  Similarly, under California law, the CFRA provides that "[f]amily care and medical leave requested pursuant to this subdivision shall not be deemed to have been granted unless the employer provides the employee, upon granting the leave request, a guarantee of employment in the same or a comparable position upon the termination of the leave." Cal. Gov't Code § 12945.2(a).  "Upon an employee's timely return from CFRA leave, an employer must generally restore the employee to the same or a comparable position." *Rogers*, 198 Cal. App. 4th at 487 (citing Gov. Code, § 12945.2(a)).

However, the "employer is not required to reinstate an employee who cannot perform her job duties after the expiration of a protected medical leave." *Rogers,* 198 Cal. App. 4th at 487 (citing *Neisendorf v. Levi Strauss & Co*., 143 Cal. App. 4th 509, 519 (2006)); see 29 C.F.R. § 825.216(c) ("If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition or an injury or illness also covered by workers' compensation, the employee has no right to restoration to another position under the FMLA.").

Here, Plaintiff's interference claims under federal and state law are based on the right to reinstatement and not any interference based on the failure to approve leave.  (*See* Dkt. No. 1, Compl. ¶¶ 105, 123.)  To the extent Plaintiff does not oppose Defendant's motion for summary judgment on his right to take medical leave for protected reasons, the Court GRANTS the motion.  However, the issue of whether Defendant interfered with Plaintiff's FMLA and CFRA rights by failing to reinstate him remains in the case. / / /

_____

commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1).

## G.     Evidentiary Objections

Defendant filed evidentiary objections to the declaration of Robert Ottilie[22] and Plaintiff's declaration as well as Exhibits 93, 122, 169, 208 to the Olsen Declaration. (Dkt. No. 57-2.)  Plaintiff also filed evidentiary objections to the declaration of Ms. Susan Brazeau.  (Dkt. No. 49-4.) The Court notes their objections.  To the extent that the evidence is proper under the Federal Rules of Evidence, the Court considered the evidence.  To the extent that the evidence is not proper, the Court did not consider it.[23]

## Conclusion

Based on the above, the Court GRANTS in part and DENIES in part Defendant's amended motion for partial summary judgment on the third through eleventh causes of action.  Specifically, the Court GRANTS summary judgment on the sixth, ninth, and eleventh causes of action for retaliation, the seventh cause of action solely as to the failure to prevent retaliation, the eighth and tenth causes of action for interference with the right to medical leave under state and federal law solely based on the right to take medical leave but not as to the right to reinstatement.  The Court DENIES summary judgment on the third, fourth, and fifth causes of action as well as the seventh cause of action solely as to the failure to prevent discrimination.

IT IS SO ORDERED.

Dated:  March 9, 2023

Hon. Gonzalo P. Curiel
United States District Judge

---

[22] Mr. Ottilie was Plaintiff's counsel in March 2021.  (Dkt. No. 60-5.)

[23] Defendant also filed a request for judicial notice of section 909.2 of the Charter of the County of San Diego and the vaccination schedule promulgated by the County HHSA.  (Dkt. No. 46-7.)  Plaintiff does not oppose.  Because judicial notice is appropriate for documents generally known and can be accurately and readily determined from sources whose accuracy cannot reasonable be questions, Fed. R. Evid. 201(b), the Court GRANTS Defendant's request for judicial notice as unopposed.  *See e.g., Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1025 n.1 (9th Cir. 2009) (taking judicial notice of a local ordinance and a local regulation).